1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5
6

CRAIG BARFIELD,

7
                            Plaintiff,

8       v.

9  KENNETH D LEWIS,

                            Defendants.
10

Case No. 3:21-cv-01099-RAJ-TLF

REPORT AND
RECOMMENDATION

Noted for April 26, 2024

11        Plaintiff, an inmate at Monroe Correctional Complex ("MCC") Special Offenders

12  Unit ("SOU"), brought this 42 U.S.C. § 1983 action alleging his former mental health

13  counselor at MCC, defendant Kenneth D. Lewis, retaliated against him for filing

14  grievances against defendant in violation of the First Amendment. *See* Dkt. 6. Plaintiff

15  proceeds unrepresented and *in forma pauperis* in this action. Dkts. 5, 6. This matter has

16  been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v.*

17  *Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a).

18         This matter is before the Court on defendant's motion for summary judgment

19  (Dkt. 85), plaintiff's motion for appointment of a forensic video expert to review a

20  surveillance video submitted in support of defendant's motion for summary judgment

21  (Dkt. 90), and plaintiff's motion requesting the Court's assistance in serving a subpoena

22  (Dkt. 92).

23
24
25

REPORT AND RECOMMENDATION - 1

1    For the reasons set forth below, the Court recommends that plaintiff's motions for

2  appointment of a forensic video expert and requesting the Court's assistance in serving

3  a subpoena (Dkts. 90 & 92) be DENIED and that defendant's motion for summary

4  judgment (Dkt. 85) be GRANTED in part and DENIED in part as provided below.

5                              <u>BACKGROUND</u>

6    Plaintiff initiated this matter on August 17, 2021, filing a complaint alleging the

7  defendant violated his First Amendment rights by retaliating against him after plaintiff

8  filed grievances and letters complaining about the defendant's conduct. Dkt. 6 at 4.[1]

9  Plaintiff seeks an award of damages but does not seek declaratory or injunctive relief.

10  *Id*. at 23–24.

11    Plaintiff's specific allegations, as set forth in his complaint and as supplemented

12  by his declaration, deposition testimony, and sworn discovery responses, were

13  previously summarized by this Court as follows:

> Plaintiff alleges that defendant Lewis treated him unprofessionally during group classroom sessions, including making inappropriate remarks, and sarcastically asking personal and uncomfortable questions. Dkt. 6 at 5. Plaintiff also asserts he was informed defendant Lewis had caused plaintiff's incentive television to be removed by falsely reporting plaintiff was not adequately following his mental health treatment plans. *Id*. at 5–6.
>
> Plaintiff states he began filing communications and grievances against defendant Lewis, including: communicating with Lewis's supervisors by sending an offender's "kite" on June 7, 2019; and a direct meeting with one supervisor, Dr. Cogburn, on June 11, 2019—after which Dr. Cogburn assured plaintiff he would "personally address this matter with Mr. Lewis." *Id*. at 7.
>
> Plaintiff states that the next day (June 12, 2019), while he was writing at his cell desk, he heard defendant Lewis on his tier "shouting out where is Barfield at," while banging his fist on cell doors. *Id*. at 8; *see also* Dkt. 37 at 73; Dkt. 23-1 at 4. Lewis then appeared at plaintiff's cell front, "knocking repeatedly on it and at the same time yelling at me to 'get-up' and come to the door," but plaintiff ignored the request. Dkt. 6 at 8; Dkt. 23-1 at 4.

---

[1] Plaintiff's complaint also includes factual allegations discussing the processing of his grievances regarding the defendant's conduct. Dkt. 6. However, to the extent the complaint could be construed as alleging a claim regarding the processing of plaintiff's grievances, any such claim was previously dismissed. *See* Dkts. 47 & 52.

Plaintiff states that, suddenly, his cell door opened and defendant Lewis entered his cell and "was right upon me . . . while yelling at me and pointing his right hand finger within my face." Dkt. 6 at 9; *see also* Dkt. 37 at 74; Dkt. 23-1 at 4. Plaintiff states defendant Lewis "kept shouting over and over again," yelling "you could of came to me about this. How dare you go behind my back. Just who do you think you [are]." Dkt. 6 at 9; *see also* Dkt. 37 at 74 (defendant Lewis "verbally intimidated[d] plaintiff by saying "how dare you go behind my back" while "aggressively pointing his fingers toward my face"); Dkt. 23-1 at 5 (defendant Lewis stated "you got a problem with me? You come see me. Don't you ever go behind my back" while pointing his finger at plaintiff's face); Dkt. 37 at 16 (defendant Lewis "threateningly" said "How dare you go behind my back if you got something you want to say to me, you say it to my face" while "aggressively pointing his fingers toward my face"). Plaintiff asserts that Lewis "kept shouting over and over again" and told him "don't you ever go behind my back again." Dkt.6 at 9; Dkt. 23-1 at 6.

Plaintiff states defendant Lewis "ball[ed] his fists up at me . . . while he was there within my cell . . . to intimidate or antagonize me . . . that he was generally prepared for a physically violen[t] confrontation with me." Dkt 37 at 74; *see also* Dkt. 37 at 16 (defendant Lewis was "demonstratively 'balling-up' his fists" during the encounter). Plaintiff's complaint further alleges:

> I thought for just[ ] those few minutes that my physical wellb[e]ing may ha[ve] been put in jeopardy while Mr. Lewis was there within my cell alone with me and the ways he was carrying on I truly felt that my life was in danger that he was going to physically attack me right in my cell!

Dkt. 6 at 9. Plaintiff observes that he was a "57 year old 165 pound 5′11″ black man," and defendant Lewis was a "237 pound 40 year old 6′3″ intimidating white man." Dkt. 6 at 10.

Plaintiff states he asked defendant Lewis to leave his cell; at that time, Corrections Officer Beecroft also appeared at the cell front and instructed defendant Lewis to leave. Dkt. 37 at 74; Dkt. 23-1 at 6. Defendant Lewis then backed out of the cell, took one step back in, then backed out again. Dkt. 6 at 9–10; Dkt. 23-1 at 7; Dkt. 37 at 75.

Plaintiff states that as defendant Lewis was leaving, he "told me don't do it again. As if implying 'or else' or making it seem to me that [there would] be consequences involved, next time around with him." Dkt. 37 at 75; *see also* Dkt. 37 at 16 (defendant Lewis said "upon his departure out of my cell door that I better not do it again"). After defendant Lewis left the cell, the door was closed and Lewis left the tier. Dkt. 6 at 10.

Dkt. 47 at 2-5.[2]

---

[2] The Court notes that plaintiff's complaint and declaration appear to indicate that all of defendant's statements were made while defendant was inside plaintiff's cell. Dkt. 6; Dkt. 37 at 16. However, plaintiff's deposition testimony appears to indicate defendant stated "you got a problem? You come talk to me" once from outside the door to the cell before the cell door

Plaintiff's complaint further indicates he filed a "staff misconduct" grievance related to this alleged incident with the defendant. Dkt. 6 at 10-11. He indicates his grievance was denied on the grounds that the evidence showed defendant did not enter plaintiff's cell and that the denial was upheld at each level of review. *Id.* Plaintiff indicates he was not permitted to view the surveillance video of the incident relied upon in denying his grievance during the grievance process. *Id.* He indicates on July 24, 2019, he submitted a public records request for the surveillance video. *Id.* at 13. He indicates on September 17, 2019, he received a letter from Public Records Specialist Lora Bronson denying him access to the video and that the denial was upheld by Public Records Appeals Officer Shari Hall. *Id.*

Defendant filed a prior motion for summary judgment in this action in which, while not conceding the facts alleged by the plaintiff, he argued that even if those facts were assumed to be true, he was entitled to summary judgment on qualified immunity grounds. Dkt. 22 at 2; Dkts. 23, 24. In denying the motion for summary judgment, the Court found that accepting plaintiff's assertions of fact as true for the purposes of the motion, defendant was not entitled to summary judgment on plaintiff's retaliation claim. Dkts. 47 & 52. Specifically, in the Court's Report and Recommendation recommending denial of the motion, which was subsequently adopted by the District Judge, the Court noted that plaintiff alleged he "had filed grievances and defendant Lewis angrily responded by walking into plaintiff's cell and acting in a manner where physical violence was being threatened." *Id.* The Court concluded that, "the facts submitted by plaintiff

---

opened and he entered and then repeated that statement and made the other alleged statements while inside of the cell. Dkt. 23-1 at 4-8.

1   (which defendant accepts as true for purposes of this motion) establish a violation of

2   plaintiff's First Amendment rights" and that "defendant's conduct may have violated a

3   First Amendment right that was clearly established at the time." *Id.*

4          Defendant now moves for summary judgment again and submits evidence in

5   support of his motion, including a prison surveillance video.[3] Dkts. 85, 86, 87, 88, 89. In

6   the instant motion, defendant argues that "[a]fter viewing the evidence, including the

7   prison surveillance video footage, no reasonable trier of fact could dispute that

8   Defendant Lewis never entered inmate Plaintiff Craig Barfield's cell, let alone even

9   talked to inmate Barfield while the door to Barfield's cell was open." Dkt. 85 at 1. Plaintiff

10  has filed opposition to the motion. Dkt. 103.

11         Plaintiff has also filed a motion for appointment of a forensic video expert to

12  review the video submitted in support of defendant's motion for summary judgment, and

13  a motion requesting the Court for assistance in serving a subpoena on Lora Bronson,

14  the public records specialist who responded to plaintiff's initial public records request for

15  a copy of the surveillance video. Dkts. 90 & 92. Defendant has filed opposition to those

16  motions. Dkts. 95, 96, 97, 98.

17         By order dated January 22, 2024, this Court noted that, upon reviewing the

18  record, in order to properly address the pending motions, supplementation/perfection of

19  the record was necessary regarding the authentication of the surveillance video

20  evidence submitted in support of defendant's second motion for summary judgment.

21

22  [3] The Court notes that during discovery, plaintiff subpoenaed the prison surveillance video of the
    June 12, 2019, incident at issue in this case, which the defendant now submits in support of his
    second motion for summary judgment. *See* Dkts. 53, 75, 81. On August 7, 2023, the Court
23  granted defendant's request for a protective order with respect to this surveillance video
    whereby plaintiff was given the opportunity to view the surveillance video but was not permitted
24  to retain a copy due to security concerns. Dkts. 75, 81.

25

1    Dkt. 106. Accordingly, the Court directed defendant to supplement/perfect the record

2    regarding the authentication of the surveillance video evidence by February 2, 2024,

3    and provided plaintiff the opportunity to respond to the supplemental evidence by

4    February 9, 2024. Dkt. 106. Pursuant to the Court's order, the defendant supplemented

5    the record, and plaintiff filed a response to the supplement. Dkts. 107, 108, 109.

6                                    DEFENDANT'S EVIDENCE[4]

7            In support of his motion for summary judgment, defendant submits the

8    declaration of Dianna Rule, Legal Liaison Officer with MCC, copies of the grievance

9    documents related to this incident, a copy of the prison surveillance video viewed and

10   relied upon in the course of the grievance investigation, and a declaration of MCC

11   Corrections Mental Health Unit Supervisor Abdussalaam Ahmad. *See* Dkts. 87, 89, 107,

12   108.

13           The grievance documents reflect the following:

14           Plaintiff's grievance alleges "the hall video camera will demonstrably show, Mr.

15   Lewis coming at me within my cell." Dkt. 87-1. The Grievance Investigator Report

16   ("Report") reflects that Correctional Mental Health Unit Supervisor Sarah Blackburn

17   investigated plaintiff's grievance. Dkt. 87-2. The Report reflects that the defendant

18   reported to Ms. Blackburn that he went to plaintiff's cell door to conduct an assessment

19   but that plaintiff was wearing headphones so he pushed the call button to have the

20   prison booth officer call out to plaintiff in his cell to notify him that the defendant was at

21   his cell front. *Id.*

22

23   _____

     [4] Plaintiff's relevant arguments and evidence are discussed specifically in detail in the discussion section
24   below. *See infra* at pp. 10-24.

25

REPORT AND RECOMMENDATION - 6

Defendant reported that instead of calling out to plaintiff the booth officer opened the door. *Id.* Defendant reported that as soon as the door opened, he walked off the tier to get an officer. *Id.* He reported he returned with Officer Beecroft back to the cell front where the door was closed and once plaintiff reported that he did not want to talk, defendant left the tier. *Id.* Defendant reported that he never entered plaintiff's cell. *Id.*

The Report reflects that Corrections Officer Perkins, in the prison booth, reported to Ms. Blackburn that he opened the door to plaintiff's cell when the call button was hit because he thought the defendant wanted to meet with the plaintiff. *Id.* He reported that when the door opened, he saw the defendant walk directly off the tier to talk to another officer and that he never saw the defendant enter the cell. *Id.* The Report further reflects that Officer Beecroft reported that the plaintiff's cell was accidentally opened by the relief officer in the booth, that after defendant exited the tier Officer Beecroft went with him back on the tier to talk to plaintiff at cell front as he was upset with the cell front being opened, and that Officer Beecroft did not see the defendant go into plaintiff's cell. *Id.*

The Report reflects that on June 14, 2019, Sgt. Meyer and Ms. Blackburn reviewed video footage of the incident in question and states:

> In the video, you observe [defendant] walk onto Tier 1 alone. [Defendant] approaches Offender Barfield's cell front and you see him discussing something at the door. Next, you see [defendant] hit the call button and stand in front of the cell. As soon as the cell door opens, [defendant] is observed walking off the tier. When the cell door closes, you see [defendant] come back to cell front with Officer Beecroft. At no point during the video observation does [defendant] enter the cell.

*Id.* The Report reflects Ms. Blackburn's conclusion that "[v]ideo footage refutes Offender Barfield's claim that [defendant] entered his cell as he was observed walking off the tier when the cell door opened for a brief period of time." *Id.* The Report further concludes

that "[b]ased upon the documentation and evidence reviewed, there is no basis to substantiate your claim." *Id.*

The denial of petitioner's grievance was upheld on appeal at Level II with the explanation that "[t]he video does not support your claim. Mr. Lewis did not enter your cell this date." Dkt. 87-3. The grievance denial was also upheld on appeal at Level III with the explanation that "there is no evidence available to support your complaint." Dkt. 87-4.

Defendant also submits a copy of the prison surveillance video reviewed as part of the grievance investigation. Dkt. 87, Ex. E; Dkt. 89. In her declaration in support of the motion, Dianna Rule states that the video is a "true and correct copy of the prison surveillance video footage of the June 12, 2019, incident reviewed as part of the Grievance Investigator Report for Mr. Barfield's Offender Complaint[.]" Dkt. 87 at 2.

The surveillance video itself reflects a date and time stamp in the upper lefthand corner. Dkt. 87, Ex. E; Dkt. 89. The date reflected is 06-12-2019 and the time stamp runs continuously from 17:40:02:328 to 17:45:29:656. *Id.* The video depicts a hallway and the outside of what appear to be various prison cells with closed doors. *Id.* At time stamp 17:41:14 the video shows an individual walking down the hallway and stopping at one of the cell doors; they appear to knock on the outside of the cell door. *Id.* At time stamp 17:41:42 the individual appears to push something. *Id.* At time stamp 17:41:54 the door to the cell starts to open and the individual immediately walks back down the hallway towards where he entered. *Id.* At time stamp 17:42:35 the cell door closes. *Id.* At time stamp 17:43:15 the same individual comes to the cell door again remains there for several seconds and then walks back down the hallway again towards where he

entered. *Id.* At time stamp 17:43:51 the individual returns with another individual, who appears to be dressed in an officer's uniform, and they both stop at the same cell door. *Id.* At time stamp 17:44:24 the second individual goes back down the hallway towards where he entered. *Id.* The first individual appears to lean against the door for several seconds and at time stamp 17:44:58 the first individual walks back down the hallway in the direction from where he entered. *Id.*[5] There is no audio on the surveillance video. *Id.*

Defendant also submits a declaration of MCC Corrections Mental Health Unit Supervisor Abdussalaam Ahmad. Dkt. 108. Mr. Ahmad states that he previously served as one of three Security Specialists at MCC from April 2016 to June 2023. *Id.* He states that as a Security Specialist his duties included being the primary contact for all requests at SOU and the IMU for security video footage for investigations and other prison matters. *Id.* He states:

> when DOC investigative staff request a copy of prison surveillance footage, in my role as a Security Specialist, I was able to pull a true and accurate copy of prison video footage, based on the specific requested location and dates/times, from the prison video surveillance system. In pulling a true and accurate copy of prison video footage, the prison video footage cannot be altered, modified or edited in any way.

*Id.* He further states that he has regularly been to Monroe Prison, South Block D Tier 1 and has reviewed the subject prison surveillance footage and "it is a true and correct recording of Monroe Prison, South Block D Tier 1 from the date and time indicated[.]"[6] *Id.*

---

[5] The Court notes that plaintiff does not dispute, and in fact appears to concede, that the individuals shown on the video are the defendant and Officer Beecroft as is also described in the Grievance Investigator Report. *See* Dkt. 90 at 1-2.

[6] The Court notes that there are some minor discrepancies between the Court's copy of the video and Mr. Ahmad's declaration – namely that Mr. Ahmad states the run time of the video ends at 17:45:21:656 while the Court's video ends at 17:45:29:656. Mr. Ahmad also indicates the video contains an identifier "Sou d tier q" in the lower left corner of the video surveillance

1

DISCUSSION

2    A.    Motion to Appoint Forensic Video Expert

3            Plaintiff moves for the Court to appoint a "forensic video expert" pursuant to ER

4    702(B) of the Federal Rules of Evidence to examine the prison surveillance video

5    defendant submitted in support of his motion for summary judgment. Dkt. 90. Defendant

6    opposes plaintiff's motion. Dkt. 97.

7            An expert witness may testify to help the trier of fact understand the evidence or

8    determine a fact at issue. Fed. R. Evid. 702. A court has discretion to appoint an expert

9    witness either by its own motion or by a party's motion. Fed. R. Evid. 706(a); *McKinney*

10   *v. Anderson*, 924 F.2d 1500, 1510-11 (9th Cir. 1991), *overruled on other grounds by*

11   *Helling v. McKinney*, 502 U.S. 903 (1991). Appointment of an expert witness may be

12   appropriate when "scientific, technical, or other specialized knowledge will assist the

13   trier of fact to understand the evidence or decide a fact in issue...." *Torbert v. Gore*,

14   2016 WL 3460262, at *2 (S.D. Cal. June 23, 2016) (internal citations and quotation

15   marks omitted).

16           Petitioner first argues an expert should be appointed because he believes the

17   video appears to have been "redacted", "rescripted" or "tampered" with. Dkt. 90 at 1-2.

18   _____

19   footage and the Court was unable to see such a notation in viewing the video. However, the
     other information Mr. Ahmad provides regarding the video, most significantly the date, is

20   substantially consistent, and Mr. Ahmad attests he is familiar with the location, and this is a true
     and correct recording of Monroe Prison, South Block D Tier 1 from the date and time indicated.

21   Accordingly, the minor inconsistencies do not appear to the Court to be material and the Court
     finds the video has been sufficiently authenticated for purposes of this motion. *See* Dkt. 108;

22   *see* Fed. R. Evid. 901(a) (To authenticate evidence, the "proponent must produce evidence
     sufficient to support a finding that the item is what the proponent claims it is."); *United States v.*

23   *Wells*, 827 F. App'x 664, 667 (9th Cir. 2020) (testimony from employee who did not work at a
     store at the time surveillance video was made could nevertheless authenticate the video; the

24   employee testified he personally knew the victim who appeared in the video and that the video
     accurately depicted the victim and the store).

25

Plaintiff asserts that the video is "somewhat blurry" and you could "not at times see Mr. Lewis or C/O Beecroft faces clearly until they were both at the front of my cell door[.]" *Id*. But plaintiff's assertions of tampering are entirely speculative. The Court has reviewed the video and while the image is perhaps not of the highest quality, this is not a sufficient basis to support an allegation or inference that the video has been in any way altered.

Plaintiff also asserts an expert should be appointed because there are discrepancies between the defendant's statements about the incident made as part of the grievance investigation against the defendant and statements made in a separate infraction report defendant made against the plaintiff. *Id*. at 3-6 (referencing Dkt. 22, Ex. B & Dkt. 37, Ex. 7). The Court has reviewed these documents and does not discern any discrepancy of significance in this case; it appears defendant's statement in support of the infraction report focused on only a portion of the incident related to plaintiff's alleged failure to follow a command, while defendant's statement made as part of the grievance investigation described defendant's actions in detail over his entire visit to the Tier, in response to the allegations set forth in plaintiff's grievance.

Finally, plaintiff argues an expert should be appointed because the response he received from Public Records Specialist Lora Bronson when he sought to obtain the surveillance video evidence during the course of the grievance investigation, indicated the evidence had been "redacted." Dkt. 90 at 6-8. Plaintiff references a portion of a letter dated September 17, 2019, from Ms. Bronson which he attached to a previous filing which states "[r]edactions have been made as appropriate per statute and are noted on the denial form/exemption log which is also enclosed." *Id*.; Dkt. 37 at 89 ("attachment

#2"). The "denial form/exemption log" attached to plaintiff's previous filing which appears to correspond to this letter states, "YOUR REQUEST FOR DISCLOSURE OF THE RECORDS IDENTIFIED WITHIN THE CORRESPONDING MATERIALS HAS BEEN DENIED TO THE EXTENT AND FOR THE REASON(S) SET FORTH BELOW. Each exemption applied to the records is associated with a number in the EXEMPTIONS SECTION below, which explains the exemption(s) relied upon to make redactions to the records." *Id.* at 91.

The form also contains a table or log with a header stating "RECORDS WITHELD IN THEIR ENTIRETY" which then specifies a "DOCUMENT DATE" of "6/12/2019", "DOCUMENT DESCRIPTION" of "Surveillance Video" "AUTHOR" and "RECIPIENT" of "Department of Corrections" and "EXEMPTION(S)" of "20.5-SURVEILLANCE VIDEO." *Id.*

The form then contains a designated "EXEMPTIONS SECTION" which states:

The following section identifies and explains the exemptions relied upon in the above table(s):
20.5-SURVEILLANCE VIDEO – Surveillance video is protected from disclosure in its entirety and has been withheld per the following citations:
RCW 42.56.240(1) – "Specific intelligence information and specific investigative records complied by investigative law enforcement, and penology agencies, and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy."
RCW 42.56.420(2) – "Those portions containing specific and unique vulnerability assessments or specific and unique emergency escape response plans at a city, county, or state adult or juvenile correctional facility, the public disclosure of which would have a substantial likelihood of threatening the security of a city, county, or state adult or juvenile correctional facility or any individual's safety."
Fisher v. Washington State Department of Corrections, No. 64818-7-I, January 24, 2011.

*Id.*

Read in its entirety and in context, the letter from Ms. Bronson does not reflect that redactions were in fact made to the video evidence as plaintiff asserts but, rather,

that the entire video was withheld from plaintiff at that time as protected from disclosure under state law.

Appointment of an expert is unwarranted. The Court concludes that appointment of an expert is not necessary or appropriate in this case and recommends that plaintiff's motion to appoint a "forensic video expert" (Dkt. 90) should be DENIED.

B.    Motion for Assistance in Serving Subpoena

Plaintiff requests assistance or direction in properly serving a subpoena to testify at a deposition upon Public Records Specialist Lora Bronson. Dkt. 92. Defendant opposes the motion. Dkt. 95.

Federal Rule of Civil Procedure 45 provides that the Clerk is required to issue such a subpoena, "signed but otherwise in blank" to a party who requests it. Fed. R. Civ. P. 45(a)(3). That party must complete it before service." Further, "[i]f a subpoena commands the production of documents, electronically stored information or tangible things … before trial, then before it is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party." Fed. R. Civ. P. 45(a)(4). "Any person over the age of 18 and not a party may serve a subpoena. Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law." Fed. R. Civ. P. 45(b). The party responsible for serving the subpoena must take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena. *See* Fed. R. Civ. P. 45 (d).

Because plaintiff is proceeding *in forma pauperis*, he is entitled to service of the subpoena by officers of the court. 28 U.S.C. § 1915(d); *James v. Scribner*, No. 1:04-CV-5878, 2008 WL 3318879, at *1 (E.D. Cal. Aug. 11, 2008) ("As plaintiff is proceeding *pro*

1    *se* and in forma pauperis, he is entitled to service of the subpoena by the United States

2    Marshal [pursuant to 28 U.S.C. § 1915(d)]."). However, courts do not utilize their

3    resources to serve such subpoenas "lightly." *Toliver v. Clackamas Cty. Jail*, No. 3:16-

4    CV-02034, 2017 WL 2273146, at *1 (D. Or. May 23, 2017).

5    "Limitations include the relevance of the information sought as well as the burden

6    and expense to the non-party in providing the requested information." *King v.*

7    *Calderwood*, No. 213CV02080, 2015 WL 7428552, at *2 (D. Nev. Nov. 20, 2015) (citing

8    Fed. R. Civ. P. 26, 45). Furthermore, generally, "[s]ubpoenas issued under Rule 45 of

9    the Federal Rules of Civil Procedure are discovery tools and they must be utilized within

10   the time period permitted for discovery in a case." *King*, 2015 WL 7428552, at *2 (citing

11   *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 561 (S.D. Cal. 1999).

12   Moreover, Rule 30 of the Federal Rules of Civil Procedure governs the procedure

13   by which depositions are taken by oral examination and imposes certain requirements.

14   Specifically, "[a] party who wants to depose a person by oral questions must give

15   reasonable written notice to every other party." Fed. R. Civ. P. 30(b)(1). "The party who

16   notices the deposition must state in the notice the method for recording the testimony."

17   Fed. R. Civ. P. 30(b)(3)(A).

18   The noticing party must also bear costs of recording the deposition. *Id.* In

19   addition, that party must arrange for an officer to conduct the depositions (absent a

20   stipulation by all parties otherwise). *Mosley v. Nangalama*, No. 2:13-CV-00270, 2014

21   WL 1877459, at *2 (E.D. Cal. May 9, 2014) (citing Fed.R.Civ.P. 30(b)(5)(A)). Moreover,

22   under 28 U.S.C. § 1915(a), while "plaintiff's *in forma pauperis* status entitles him to a

23   waiver of the filing fee and free service of process by United States Marshals …it does

24

25

not entitle him to waiver of witness fees, mileage or deposition officer fees. *Jackson v. Woodford*, No. CIV 05CV0513-L NLS, 2007 WL 2580566, at *1 (S.D. Cal. Aug. 17, 2007) (citing 28 U.S.C. § 1915(a) and *Tedder v. Odel*, 890 F.2d 210, 211 (9th Cir. 1989)).

Here, plaintiff's motion should be denied for several reasons. First, plaintiff seeks the Court's assistance in serving a subpoena long after the discovery period in this case has closed.[7] Plaintiff's subpoena, attached to his motion, is also inadequate as it does not provide a date or time, nor does it identify a deposition officer or the method of recording testimony. *See Mosley v. Nangalama*, No. 2:13-CV-00270, 2014 WL 1877459, at *3 (E.D. Cal. May 9, 2014) (denying request to authorize service by Marshal of "inadequate" subpoenas that failed to provide date or time or identify a deposition officer).

Furthermore, plaintiff fails to demonstrate that the subpoena seeks information relevant to a claim or defense in this action. Rather, plaintiff seeks to depose Ms. Bronson based upon his argument that the "blurriness" of the video indicates it has been tampered with, as well as the September 17, 2019, letter from Ms. Bronson which includes the word "redaction." For the same reasons discussed above in addressing plaintiff's motion to appoint a forensic video expert (Dkt. 90), the Court finds plaintiff's challenges to the video evidence and allegations regarding "redaction" of the evidence by Ms. Bronson to be entirely speculative and unsupported by the record.

---

[7] The Court notes that the original pretrial scheduling order in this case set a deadline for completion of discovery by March 31, 2022. Dkt. 15. The Court subsequently granted plaintiff's request to reopen discovery on two occasions but solely for the limited purpose of service of and response to a subpoena to DOC for specific documents and information identified in Dkt. 21 at pp. 11-14. Dkts. 53, 54, 69, 71.

1    Accordingly, plaintiff's motion for assistance in serving a subpoena (Dkt. 92)

2    should be DENIED.

3    C.    Motion for Summary Judgment

4    Defendant also moves for summary judgment on the basis that that "[a]fter

5    viewing the evidence, including the prison surveillance video footage, no reasonable

6    trier of fact could dispute that Defendant Lewis never entered inmate Plaintiff Craig

7    Barfield's cell, let alone even talked to inmate Barfield while the door to Barfield's cell

8    was open." Dkt. 85 at 1. Plaintiff opposes the motion. Dkt. 103.

9    Summary judgment is supported "if the movant shows that there is no genuine

10    issue as to any material fact and that the movant is entitled to judgment as a matter of

11    law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden to demonstrate the

12    absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S.

13    317, 323 (1986). A genuine dispute concerning a material fact is presented when there

14    is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

15    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A fact "relevant to an

16    element of a claim or defense and whose existence might affect the outcome of the

17    suit," and the materiality of which is "determined by the substantive law governing the

18    claim" is considered a material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

19    *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

20    When reviewing a motion for summary judgment, "[t]he evidence of the non-

21    movant is to be believed, and all justifiable inferences are to be drawn in [their] favor."

22    *Anderson,* 477 U.S. at 255. Yet the Court is not allowed to weigh evidence or decide

23    credibility. *Id*. If the moving party meets the initial burden, an adverse party may not rest

24    upon the mere allegations or denials of his pleading; their response, by affidavits or as

25

otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court may not disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

In response to the motion for summary judgment, the nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. Univ. of Oregon,* 698 F.3d 715, 728–29 (9th Cir. 2012).

To state a claim under 42 U.S.C. § 1983, plaintiff must show (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, plaintiff must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *Arnold v. Int'l Bus. Machines*, 637 F.2d 1350, 1355 (9th Cir. 1981). A plaintiff may not hold supervisory personnel liable under § 1983 for constitutional deprivations under a theory of supervisory liability. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Plaintiff's sole legal claim alleges defendant violated his First Amendment rights by retaliating against him for asserting grievances. An allegation of retaliation for a

prisoner's exercise of his First Amendment right to file grievances or to pursue litigation against prison officials may support a claim under § 1983; without this constitutional protection, inmates would be left without a viable mechanism to remedy prison injustices. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

Plaintiff must prove five basic elements to prevail on such a claim of retaliation: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567–568. The plaintiff must also show the protected conduct was the substantial or motivating factor driving the prison official's conduct. *See, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286–287 (1977); *Brodheim v. Cry,* 584 F.3d 1262, 1271 (9th Cir. 2009).

Here, plaintiff submits facts that defendant angrily banged on plaintiff's cell door, entered his cell, yelled at plaintiff while pointing his finger at plaintiff's face and was "balling up his fist" and acting in a manner that led plaintiff to feel fear of physical violence. Dkt. 6 at 8–10; Dkt. 37 at 16, 73–76; Dkt. 23-1 at 4–6. Plaintiff also submits facts that defendant "verbally intimidated" him by shouting at him "how dare you go behind my back. Just who do you think you [are]" and "you got a problem with me? You come see me. Don't you ever go behind my back." Dkt. 6 at 9; *see also* Dkt. 37 at 16, 74; Dkt. 23-1 at 5. Plaintiff further submits facts that defendant also "told me don't do it again. As if implying 'or else' or making it seem to me that [there would] be consequences involved, next time around with him." Dkt. 37 at 75; *see also* Dkt. 37 at 16.

It is clear that threats of physical violence can constitute adverse action for purposes of a retaliation claim. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (prison official's threat to punch an inmate for filing a grievance was an adverse action). However, more veiled verbal threats have also been found to constitute adverse action for purposes of a retaliation claim. *See Brodheim*, 548 F.3d at 1266-67, 1270-71 (evidence of an officer's statement to a grievant that "I'd also like to warn you to be careful what you write" was sufficient to create a genuine issue of material fact as to whether this constituted an adverse action and whether that action "would chill or silence a person of ordinary firmness from future First Amendment activities.").

Here, with respect to the physical acts of intimidation plaintiff alleges – defendant's entering plaintiff's cell, yelling and pointing his finger in plaintiff's face and balling his fists up in a manner that led plaintiff to feel fear of physical violence -- plaintiff's version of events is directly contradicted by the video evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *and see id.* at 380-81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.") (emphasis added).

As discussed above, the video evidence shows that, contrary to plaintiff's claim, defendant did not enter plaintiff's cell at the time in question, did not point his finger in plaintiff's face, nor did he ball his fists up in a threatening manner while inside the cell or

even speak to plaintiff while the door to his cell was open. The video evidence is also

consistent with the statements made by defendant, Officer Beecroft, and Officer

Perkins, in the Grievance Investigator Report with respect to defendant's physical

actions – that defendant did not enter plaintiff's cell. The Court finds that plaintiff's

version of the events is so clearly contradicted by the video evidence, that no

reasonable jury could believe plaintiff with respect to these allegations. *See Scott*, 550

U.S. at 380.[8]

       Plaintiff, in opposing the motion, offers only speculative and conclusory

allegations that the video evidence has been "tampered" with. Dkt. 103. Plaintiff argues

he was not permitted to view the video evidence during the course of the grievance

investigation and that this led to his suspicion regarding the legitimacy of the footage. *Id.*

at 5. But the fact that plaintiff was not permitted to view the video evidence during the

grievance investigation does support an inference that the video had been tampered

with. Furthermore, the letter from Public Records Specialist Lora Bronson, discussed

above, reflects that the video evidence was initially withheld from plaintiff in its entirety

on the grounds that it was protected from disclosure under state law.

       Plaintiff also argues again that the blurriness of the images on the video support

an inference that the video was tampered with. Dkt. 103 at 7-8. However, as discussed

---

[8] In his response to the defendant's supplemental submission of evidence regarding the video, plaintiff notes that defendant's infraction report against plaintiff reflects a time of 17.35 as the time he went to speak to plaintiff and that he did not make reference to the door accidentally opening or Officer Beecroft returning with him in that report. Dkt. 109. It is not entirely clear what plaintiff is trying to argue here. However, as discussed above, the Court does not discern any significant discrepancies between the nature of the incident reported on the infraction report filed by defendant against plaintiff and defendant's statements in the Grievance Investigation Report (*see supra* at pp. 11), nor does plaintiff appear to allege at any point that defendant came to his cell to speak to him on multiple occasions on the same date during the same time frame.

above, plaintiff's assertions of tampering are entirely speculative. The Court has

reviewed the video and while it agrees the image is perhaps not of the highest quality,

this is not a sufficient basis to conclude, or support an allegation or inference, that the

video has been in any way intentionally altered.

Plaintiff also, once again, points to alleged discrepancies between the Grievance

Investigation Report based on plaintiff's allegations against defendant and the infraction

report based on defendant's allegations against plaintiff. *Id.* at 9-11. Specifically, plaintiff

states that in the infraction report defendant wrote regarding plaintiff's refusal to speak

to him when he was outside his cell on June 12, 2019, he makes no mention of the cell

accidentally opening up. *Id.* But defendant's statement that plaintiff failed to follow a

command by refusing to speak with him when he was at his cell door does not, in fact,

contradict any of his statements made to Ms. Blackburn and documented in the

Grievance Investigation Report. Rather, it appears defendant's statements in the

infraction report focused only on the portion of the incident that were relevant to the

infraction he was alleging, i.e., the failure to follow a command.

Thus, viewing the facts in the light depicted by the video evidence -- which

directly contradicts plaintiff's allegations -- the Court should hold that no reasonable jury

could find in favor of plaintiff with respect to the physical acts of intimidation, namely,

plaintiff's allegations that defendant entered plaintiff's cell, yelling and pointing his finger

in plaintiff's face and balling his fists up in a manner that led plaintiff to feel fear of

physical violence. Accordingly, defendant's motion for summary judgment (Dkt. 85)

should be granted with respect to these allegations.

1          But -- with respect to plaintiff's allegations regarding defendant's verbal

2  statements -- genuine issues of material fact preclude summary judgment. Plaintiff

3  alleges defendant "verbally intimidated" him by shouting at him "how dare you go behind

4  my back. Just who do you think you [are]" and "you got a problem with me? You come

5  see me. Don't you ever go behind my back." Dkt. 6 at 9; *see also* Dkt. 37 at 16, 74; Dkt.

6  23-1 at 5. Plaintiff states that defendant also "told me don't do it again. As if implying 'or

7  else' or making it seem to me that [there would] be consequences involved, next time

8  around with him." Dkt. 37 at 75; *see also* Dkt. 37 at 16. While the video shows

9  defendant did not enter plaintiff's cell or engage in any of the physical forms of

10  intimidation plaintiff alleges – entering plaintiff's cell, and pointing his finger in plaintiff's

11  face and balling his fists up while inside plaintiff's cell in a manner that led plaintiff to feel

12  fear of physical violence -- the video does not include audio. Thus, the video fails to

13  resolve genuine disputes of material facts whether defendant did, or did not, raise his

14  voice to the point of yelling or make the statements plaintiff alleges.[9] Such statements, if

15  made, are sufficient to support an actionable retaliation claim.

16          The Ninth Circuit has held, to constitute adverse action for purposes of a

17  retaliation claim "[plaintiff] need not … establish that [defendant's] statement contained

18  an explicit, specific threat of discipline or transfer if he failed to comply… [T]he question

19  for the district court to ask is whether 'the record, taken in the light most favorable to the

20  plaintiff, reveals statements by the defendant that a reasonable factfinder could ...

21

22  [9] The Court notes that although the video evidence refutes plaintiff's allegations that defendant
was inside plaintiff's cell when alleged statements occurred, the video does not establish
23  whether statements were or were not made while defendant was outside of the cell. Any
inconsistencies between the video and plaintiff's allegations regarding defendant's location
24  when the challenged statements were allegedly made may be relevant to the issue of plaintiff's
credibility at trial but the Court on summary judgment does not resolve questions of credibility.

25

REPORT AND RECOMMENDATION - 22

interpret as intimating that some form of punishment or adverse regulatory action would follow.'" *Brodheim*, 584 F.3d at 1270 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003) (per curiam) (internal marks omitted). With respect to the chilling effect, the Ninth Circuit has held that "an objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 568–69 (9th Cir. 2005)).

Thus, in *Brodheim*, the Court concluded that evidence of an officer's statement to a grievant that "I'd also like to warn you to be careful what you write" was sufficient to create a genuine issue of material fact as to whether the statement constituted an adverse action and whether that action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1266-67. The statements plaintiff alleges defendant made here are comparable to those made in *Brodheim*. *Id*.

Based on the record before the court, a genuine issue of material fact exists as to whether defendant made the statements plaintiff alleges and whether they constituted an adverse action by "intimat[ing] that some form of punishment or adverse regulatory action would follow a failure to comply" and "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1270.

With respect to the element of causation, plaintiff has submitted facts demonstrating defendant's actions referred to and were a direct reaction to plaintiff's grievances. The filing of grievances is protected activity. *Rhodes*, 408 F.3d at 567.

Defendant's retaliatory motive is reflected both in the words plaintiff reports he used (which referred directly to plaintiff's grievances), and the timing of the incident (the day after plaintiff met with defendant's supervisor). *See Watison*, 668 F.3d at 1114 ("because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal."). Accordingly, genuine issues of material fact remain with respect to this element of the claim as well.

Finally, defendant has proffered no legitimate penological goal that could be met by making the alleged statements to plaintiff regarding plaintiff's grievance. Accordingly, genuine issues of material fact remain with respect to this element of the claim as well.

Thus, defendant's motion for summary judgment should be granted as to plaintiff's First Amendment retaliation claim for physical conduct inside plaintiff's cell that plaintiff alleged was retaliatory. The record establishes the following facts as a matter of law: that defendant did not enter plaintiff's cell, did not point his finger in plaintiff's face or ball his fists up while inside plaintiff's cell in a manner that led plaintiff to feel fear of physical violence. Defendant's motion for summary judgment should be denied with respect to the oral statements plaintiff alleges defendant made to him regarding his grievance – genuine issues of material fact remain as to whether those statements were made, and if they were, whether they establish retaliation.

## CONCLUSION

Based on the foregoing discussion, the undersigned recommends that plaintiff's motions for appointment of a forensic video expert and requesting the Court's assistance in serving a subpoena (Dkts. 90 & 92) be DENIED. The undersigned further recommends that defendant's motion for summary judgment (Dkt. 85) be GRANTED in

part and DENIED in part. Defendant's motion for summary judgment (Dkt. 85) should be GRANTED as to plaintiff's First Amendment retaliation claim for physical conduct inside plaintiff's cell that plaintiff alleged was retaliatory. The record establishes the following facts as a matter of law: that defendant did not enter plaintiff's cell, did not point his finger in plaintiff's face or ball his fists up while inside plaintiff's cell in a manner that led plaintiff to feel fear of physical violence. Defendant's motion for summary judgment (Dkt. 85) should be DENIED with respect to the oral statements plaintiff alleges defendant made to him regarding his grievance -- genuine issues of material fact remain as to whether those statements were made, and if they were, whether they establish retaliation. A proposed order is attached.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on **April 26, 2024**, as noted in the caption.

Dated this 4th day of April, 2024.

*Theresa L. Fricke*
_____
Theresa L. Fricke
United States Magistrate Judge